**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| The Methodist Hospital d/b/a Houston Methodist Hospital,<br><br>    Plaintiff,<br><br>  v.<br><br>Claritev Corporation; MultiPlan, Inc.; Centene Corporation; The Cigna Group; Humana Inc.; Kaiser Foundation Health Plan, Inc.; UnitedHealth Group Inc.; Luminare Health Benefits Inc.; Allied Benefit Systems, LLC; and Imagine360, LLC.<br><br>    Defendants. | Case No. 1:25-cv-9349<br><br>MDL No. 3121<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

**THE METHODIST HOSPITAL D/B/A HOUSTON METHODIST HOSPITAL'S DIRECT ACTION PLAINTIFF SHORT-FORM COMPLAINT**

  The Plaintiff named below files this Short-Form Complaint and (if checked off below) Demand for Jury Trial against the Defendant(s) named below by and through the undersigned counsel. Plaintiff incorporates by reference the factual allegations, as well as the claims and relief checked off below, sought in the Consolidated Master Direct Action Plaintiff Complaint ("Consolidated Master DAP Complaint") as it relates to the named Defendant(s) (checked-off below), filed in *In re Multiplan Health Insurance Provider Litigation*, MDL No. 3121, in the United States District Court for the Northern District of Illinois. Plaintiff files this Short-Form Complaint pursuant to Case Management Order No. 6, filed on the MDL Docket (No. 1:24-cv-06795) at ECF 179.

1

Plaintiff indicates by checking the relevant boxes below the Parties, Designated Forum, Jurisdiction and Venue, Causes of Actions and other Relevant Information specific to Plaintiff's case. Plaintiff, by and through the undersigned counsel, alleges as follows:

## I. IDENTIFICATION OF PARTIES

1. **PLAINTIFF**

2. Name of the Plaintiff alleging claims against Defendant(s): **The Methodist Hospital d/b/a Houston Methodist Hospital ("Houston Methodist")**

3. For each Plaintiff that is a corporation, list the state of incorporation and state of principal place of business. For each Plaintiff that is an LLC or partnership, list the state citizenship of each of its members. For each Plaintiff that is a natural person, list the state of residency and citizenship at the time of the filing of this Short-Form Complaint [Indicate State[s]]:

   **Texas**

4. **DEFENDANT(S)**

5. Plaintiff names the following Defendant(s)[1] in this action [*Check all that apply*]:

   | X | Claritev Corporation; MultiPlan, Inc.[2] |
   |---|---|
   |   | Aetna, Inc., a subsidiary of CVS Health Corporation |
   |   | Blue Shield of California Life & Health Insurance Company |
   |   | Blue Cross Blue Shield of Michigan Mutual Insurance Company |
   |   | Aware Integrated, Inc. and BCBSM, Inc. d/b/a Blue Cross Blue Shield Of Minnesota |
   |   | Cambia Health Solutions, Inc. f/k/a The Regence Group |

---

[1] Each Defendant named in this Short-Form Complaint acted directly or through each of that entity's executives, employees, directors, and majority-owned subsidiaries. For example, UnitedHealth Group Inc. acted directly or through, among others, the following majority-owned subsidiaries: United Healthcare Insurance Company, and its affiliates; United Healthcare Services Inc.; United Healthcare Service LLC; Oxford Benefit Management, Inc.; UMR, Inc.; Sierra Health and Life Insurance Company, Inc.; Sierra Health-Care Options, Inc.; Health Plan of Nevada, Inc.; and United Healthcare of Florida, Inc.

[2] Since the format of this short-form complaint was adopted by the Court, MultiPlan, Inc. has conceded that it is subject to government investigations; replaced its CEO, COO, CFO, and general counsel; and changed its name to "Claritev."

| | |
|---|---|
| X | Centene Corporation |
| X | The Cigna Group |
| | Elevance Health, Inc. f/k/a Anthem, Inc. |
| | Health Care Service Corporation |
| | Highmark Health |
| | Horizon Healthcare Services, Inc. d/b/a Horizon Blue Cross Blue Shield of New Jersey |
| X | Humana Inc. |
| X | Kaiser Foundation Health Plan, Inc. |
| | Molina Healthcare, Inc. |
| X | UnitedHealth Group Inc. |
| | Allied National, LLC |
| | Benefit Plans Administrators of Eau Claire, LLC |
| | Central States Southeast and Southwest Areas Health and Welfare Fund |
| | Consociate, Inc. d/b/a Consociate Health |
| | Healthcare Highways Health Plan (ASO), LLC |
| | Secure Health Plans Of Georgia, LLC d/b/a Secure Health |
| | Sanford Health Plan |
| | CareFirst Of Maryland |
| | Blue Cross Blue Shield of Massachusetts |

6. **OTHER DEFENDANTS**

7. For each "Other Defendant" Plaintiff contends are additional parties and are liable or responsible for Plaintiff's damages alleged herein, Plaintiff must identify by name each Defendant and its citizenship, and Plaintiff must plead the specific facts supporting any claim against each "Other Defendant" in a manner complying with the requirements of the Federal Rules of Civil Procedure. In doing so, Plaintiff may attach additional pages to this Short-Form Complaint.

3

|   | **NAME** | **CITIZENSHIP** |
|---|---|---|
| 1 | Trustmark Benefits Services n/k/a Luminare Health Benefits Inc. | Delaware, California |
| 2 | Allied Benefit Systems, LLC. | Illinois |
| 3 | Group & Pension Administrators, Inc. n/k/a Imagine360, LLC | Delaware, Pennsylvania |

## II. DESIGNATED FORUM

8. For Direct Filed Cases: Identify the Federal District Court in which the Plaintiff would have filed in the absence of direct filing: **Northern District of Illinois**

9. For Transferred Cases: Identify the Federal District Court in which the Plaintiff originally filed and the date of filing: **Not Applicable**

## III. JURISDICTION AND VENUE

10. Subject Matter Jurisdiction is based on:

    ☐ Diversity of Citizenship
    ☒ Federal Question
    ☐ Other (The basis of any additional grounds for jurisdiction must be pled in sufficient detail as required by the applicable Federal Rules of Civil Procedure):
    _____
    _____

## IV. FACTS AND INJURIES ASSERTED

11. Plaintiff adopts all paragraphs of the Consolidated Master DAP Complaint by reference, except for the allegations set forth in any cause of action that Plaintiff does not adopt (as indicated below). **Houston Methodist adopts all allegations in the Consolidated Master DAP Complaint.**

12. Plaintiff adopts and alleges as injuries resulting from the challenged conduct the injuries to DAPs set forth in the Consolidated Master DAP Complaint.

4

## V. ADDITIONAL FACTS DEMONSTRATING STANDING TO BRING CAUSES OF ACTION

13. Plaintiff alleges the following additional facts in support of its standing to bring causes of action:

    **See attached additional pleadings.**

## VI. CAUSES OF ACTION ASSERTED

14. Plaintiff adopts and asserts the following Causes of Action alleged in the Consolidated Master DAP Complaint, and the allegations with regard thereto, against the Defendants identified above (*check all that are adopted*).

| Check all that apply | Count | Cause of Action | Law pursuant to which the cause of action is asserted in the Master Complaint |
|---|---|---|---|
| ☐ | I | Horizontal Agreements in Restraint of Trade (Section 1 of the Sherman Act, 15 U.S.C. § 1) | Federal Law |
| ☒ | II | Hub-And-Spoke Agreement in Restraint of Trade (Section 1 of the Sherman Act, 15 U.S.C. § 1) | Federal Law |
| ☒ | III | Principal-Agent Combinations in Restraint of Trade (Section 1 of the Sherman Act, 15 U.S.C. § 1) | Federal Law |
| ☒ | IV | Agreements to Unreasonably Restrain Trade (Section 1 of the Sherman Act, 15 U.S.C. § 1) | Federal Law |
| ☒ | V | Anticompetitive Information Exchange (Section 1 of the Sherman Act, 15 U.S.C. § 1) | Federal Law |
| ☐ | VI | Violation of State and D.C. Antitrust Statutes | |
| ☐ | VII | Violation of State Consumer Protection Laws | |
| ☐ | VII | Unjust Enrichment | |

### NOTE

If Plaintiff wants to allege additional Causes of Action other than those selected in the preceding paragraph, which are the Causes of Action set forth in the Master Complaint, the facts supporting those additional Causes of Action, must be pled in a manner complying with the requirements of the Federal Rules of Civil Procedure. In doing so, Plaintiff may attach additional pages to this Short-Form Complaint.

## VII. ADDITIONAL CAUSES OF ACTION

15. Plaintiff asserts the following additional Causes of Action and supporting allegations against the following Defendants:

   **None**. _____
   _____
   _____
   _____

## VIII. PRAYER FOR RELIEF

16. *Check all that apply*:

[X] **WHEREFORE,** Plaintiff prays for all available compensatory damages, treble damages, punitive damages in amounts to be proven at trial, and judgment against Defendant(s) and all such further relief that this Court deems equitable and just as set forth in the Master Complaint, and any additional relief to which Plaintiff may be entitled, including disgorgement.

[X] **WHEREFORE,** Plaintiff prays for declaratory and injunctive relief and judgment against Defendant(s) and all such further relief that this Court deems equitable and just as set forth in the Master Complaint, and any additional relief to which Plaintiff may be entitled.

## JURY DEMAND

[*Check the applicable box*]:

[X] Plaintiff hereby demands a trial by jury as to all claims in this action.

[ ] Plaintiff **does not demand** a trial by jury as to all claims in this action.

****

By signature below, Plaintiff's counsel hereby confirms their submission to the authority and jurisdiction of the United States District Court of the Northern District of Illinois and oversight of counsel's duties under Federal Rule of Civil Procedure 11, including enforcement as necessary through sanctions and/or revocation of *pro hac vice* status.

6

|  |  |
|---|---|
| Dated: August 6, 2025 | */s/ Stephen M. Medlock* |
| | Stephen M. Medlock |
| | Stephen Cohen |
| | Rami Abdallah E. Rashmawi |
| | **VINSON & ELKINS LLP** |
| | 2200 Pennsylvania Ave., N.W. |
| | Suite 500 West |
| | Washington, DC 20037 |
| | Tel: (202) 639-6500 |
| | Fax: (202) 639-6604 |
| | smedlock@velaw.com |
| | scohen@velaw.com |
| | rrashmawi@velaw.com |
| | |
| | Michael Scarborough |
| | Dylan Ballard |
| | Madison Lo |
| | 555 Mission Street |
| | Suite 2000 |
| | San Francisco, CA 94105 |
| | Tel: (415) 979-6900 |
| | Fax: (415) 651-8786 |
| | mscarborough@velaw.com |
| | dballard@velaw.com |
| | mlo@velaw.com |
| | |
| | Mackenzie Newman |
| | 1114 Avenue of the Americas |
| | New York, NY 10036 |
| | Tel: (212) 237-0000 |
| | Fax: (212) 237-0100 |
| | mnewman@velaw.com |
| | |
| | *Counsel for Plaintiff* |

## **CERTIFICATE OF SERVICE**

The undersigned attorney certifies that on August 6, 2025, he electronically filed a copy of the attached via the CM/ECF filing system, which sent notification of such filing to all Filing Users.

*/s/ Stephen M. Medlock*
Stephen M. Medlock

## ADDITIONAL FACTUAL ALLEGATIONS

1. The Methodist Hospital d/b/a Houston Methodist Hospital ("Houston Methodist") is a faith-based, not-for-profit health system headquartered in Houston, Texas. Founded in 1919, Houston Methodist's physicians and specialists are on the front lines of medical innovation, teaching, and treatment. Houston Methodist's doctors offered the full spectrum of medical specialties, such as neurosurgery, cardiac surgery, transplant, cancer, orthopedics and behavioral health services. Facilities within Houston Methodist are routinely rated among the best hospitals in the United States.

2. Houston Methodist consists of nine hospitals, emergency care centers, imaging centers, breast care centers, comprehensive care centers, surgical centers and physicians groups. The nine hospitals are:

    a. Houston Methodist Hospital in the Texas Medical Center, the flagship academic hospital of Houston Methodist that provides a comprehensive range of state-of-the-art medical care and that is consistently recognized as one of the best hospitals in the United States;

    b. Houston Methodist Baytown Hospital, a community-based, not-for-profit hospital serving the Baytown, East Harris, Liberty and Chamber counties, offering the full spectrum of medical and surgical services for all ages and stages of life, including emergency care, cancer care, women's services, cardiology, neurology, stroke care, primary care and a range of other specialty services;

    c. Houston Methodist Clear Lake Hospital, a community-based, not-for-profit hospital located in Nassau Bay, offering a broad spectrum of medical and surgical care for all ages, including cancer care, stroke care, orthopedics and sports medicine, and women's health;

9

d. Houston Methodist Cypress Hospital, a community-based, not-for-profit hospital opened in March 2025, offering the latest technology including advanced diagnostic imaging, minimally invasive surgery to speed recovery and reduce hospital stays, and video integration with facilities worldwide;

e. Houston Methodist Sugar Land Hospital, a community-based, not-for-profit hospital serving the Fort Bend County, offering medical care including women's health services, cancer care, neurology and neurosurgery, orthopedics and sports medicine, wound care and hyperbaric medicine, and heart and vascular care;

f. Houston Methodist The Woodlands Hospital, a community-based, not-for-profit hospital serving the Montgomery County and the North Houston region, offering a wide range of primary and specialty care services including breast care, cancer treatment, heart and vascular services, neurology, orthopedics & sports medicine, rehabilitation services and women's health;

g. Houston Methodist West Hospital, a community-based, not-for-profit hospital serving the Western Houston region, offering multiple areas of services including cancer care, heart and vascular services, spine and orthopedics and sports medicine;

h. Houston Methodist Willowbrook Hospital, a community-based, not-for-profit hospital serving the Northern Houston region, offering a wide range of primary and specialty care services including cancer care, neurology and neurosurgery, heart and vascular, orthopedics and sports medicine, and women's services; and

i. Houston Methodist Continuing Care Hospital, a long-term acute care hospital that serves the Greater Houston area, focused on the needs of patients requiring extended hospitalization.

10

3. Houston Methodist has been harmed by the MultiPlan Cartel suppressing the allowed amounts for out-of-network services purchased by third-party payors. In 2024, Houston Methodist submitted over $1.2 billion in charges for out-of-network care. Third-party payors allowed less than $250 million for those out-of-network services, severely reducing the revenue that Houston Methodist received in exchange for providing those out-of-network services. These losses were caused, in part, by the MultiPlan Cartel. For example, performance reports created by MultiPlan show that members of the MultiPlan Cartel used MultiPlan's common pricing methodology to underpay Houston Methodist for out-of-network services.

4. Upon information and belief, each of the defendants named in this short-form complaint, including Trustmark, Allied Benefit Systems, and GPA, have each executed an out-of-network pricing agreement with MultiPlan ("Co-Conspirators"), abdicating out-of-network pricing authority to MultiPlan, and have performed other acts and made other statements in furtherance of the conspiracy.

5. *Centene*. Centene Corporation ("Centene") is a named defendant in the Consolidated Master DAP Complaint. Centene has executed out-of-network pricing agreements with MultiPlan, abdicating out-of-network pricing authority to MultiPlan, and has performed other acts and made other statements in furtherance of the conspiracy. As a result of its conduct, Centene has underpaid Houston Methodist for out-of-network goods and services, including through its brand Ambetter Health, and its wholly-owned payor-subsidiaries, Magellan Health Inc. ("Magellan") and Health Net, Inc. ("Health Net").

6. *Trustmark.* Trustmark Benefits Services, n/k/a Luminare Health Benefits Inc. ("Trustmark"), is a corporation organized under the laws of Delaware with its principal place of business in California. Trustmark is a wholly owned subsidiary of Health Care Service Corporation

11

("HCSC"). As a third-party administrator ("TPA"), Trustmark performs administrative tasks for health insurance plans, including claims processing and pricing, billing, enrollment, and customer service.

7. Trustmark has executed out-of-network pricing agreements with MultiPlan, abdicating out-of-network pricing authority to MultiPlan, and has performed other acts and made other statements in furtherance of the conspiracy. Trustmark has subscribed to MultiPlan's negotiation service, Data iSight service, and Surprise Bill service. Trustmark became a client of MultiPlan no later than September 2015. According to the monthly performance reports made by MultiPlan, in 2022, Trustmark realized tens of millions of dollars in "savings" from its underpayments to out-of-network medical providers as a result of the MultiPlan Cartel in that year alone.

8. ***Allied Benefit Systems.*** Allied Benefit Systems, LLC. ("Allied Benefit Systems") is an Illinois limited liability company with its principal place of business in Illinois. Allied Benefit Systems is the largest independent TPA in the United States. As a TPA, Allied Benefit Systems performs administrative tasks for health insurance plans, including claims processing and pricing, billing, enrollment, and customer service.

9. Allied Benefit Systems has executed out-of-network pricing agreements with MultiPlan, abdicating out-of-network pricing authority to MultiPlan, and has performed other acts and made other statements in furtherance of the conspiracy. Allied Benefit Systems has subscribed to MultiPlan's negotiation service, Data iSight service, and Surprise Bill service. Allied Benefit Systems became a client of MultiPlan no later than September 2015. According to a monthly performance report made by MultiPlan, in 2022, Allied Benefit Systems realized tens of millions

of dollars in "savings" from its underpayments to out-of-network medical providers as a result of the MultiPlan Cartel in that year alone.

10. **GPA.** Group & Pension Administrators, Inc. n/k/a Imagine360, LLC ("GPA") is a Delaware limited liability company with its principal place of business in Pennsylvania. As a TPA, GPA performs administrative tasks for health insurance plans, including claims processing and pricing, billing, enrollment, and customer service.

11. GPA has executed out-of-network pricing agreements with MultiPlan, abdicating out-of-network pricing authority to MultiPlan, and has performed other acts and made other statements in furtherance of the conspiracy. GPA has subscribed to MultiPlan's negotiation service, Data iSight service, and Surprise Bill service. GPA became a client of MultiPlan no later than September 2015. Upon information and belief, GPA remains a client of MultiPlan to this day.

12. ***MultiPlan Client Advisory Board Meetings.*** The conspiracy was successfully implemented through the annual gatherings of the executives of MultiPlan and Co-Conspirators.

13. For example, Nancy Eckrich, the former President and Chief Executive Officer of Trustmark, attended the 2015, 2016, 2017, 2018, 2019, 2021, 2022, and 2023 MultiPlan Client Advisory Board Meetings. The attendance history indicates that Trustmark has long been a member of the MultiPlan Cartel.

14. As another example, Patrick Gabrione, the former Chief Operating Officer of Allied Benefit Systems, attended the 2015, 2016, 2017, 2018, 2019, 2021, and 2022 MultiPlan Client Advisory Board Meetings. After Mr. Gabrione's retirement in early 2023, Martin Laskowski, the Senior Vice President of Commercial Solutions at Allied Benefit Systems, attended the 2023 MultiPlan Client Advisory Board Meeting. The attendance history indicates that Allied Benefit Systems has long been a member of the MultiPlan Cartel.

15. Likewise, Jeff McPeters, the President of GPA, attended the 2015, 2016, 2017, and 2018 MultiPlan Client Advisory Board Meetings. Following GPA's merger and the formation of its successor, Imagine360, LLC, on January 18, 2022, Jeff Bak, the President and CEO of Imagine 360, LLC, attended the 2022 and 2023 MultiPlan Client Advisory Board Meetings. The attendance history indicates that GPA has long been a member of the MultiPlan Cartel.

16. The Client Advisory Board Meetings were a meeting of the "rim" of MultiPlan's hub-and-spoke conspiracy. For example, the 2019 meeting included 132 attendees from 78 companies, including representatives of MultiPlan, Cigna, Blue Cross Blue Shield of Minnesota, Kaiser, HCSC, Humana, Elevance, Secure Health, United Health, Sanford, Blue Cross Blue Shield of Michigan, Molina, BPA, Consociate, Centene's subsidiary Health Net, and Highmark, among others.

17. The Client Advisory Board Meetings included both business sessions with presentations from MultiPlan executives and social functions, such as cocktail hours, golf, and guided hikes.

18. No antitrust guidance concerning competitor communications was provided to attendees at the Client Advisory Board Meetings and no antitrust attorneys monitored the proceedings to make sure that discussions did not include legally improper topics or competitive sensitive information.

19. During Client Advisory Board meetings, MultiPlan's executives described *collective* changes that MultiPlan was making to the pricing methodology that Defendants used and how much money Defendants would make *collectively* through these tweaks to MultiPlan's collective pricing methodology. For example, in a 2015 speech to the MultiPlan Client Advisory Board Meeting, Michael Ferrante, the former Executive Vice President and Chief of Operation for

14

MultiPlan, explained changes that MultiPlan had made to its Data iSight and negotiation services rules that resulted in payors collectively paying providers tens of millions of dollars less for out-of-network services. Mr. Ferrante also described real-time and forward-looking changes that MultiPlan would be making to its collective pricing rules for out-of-network services and the projected underpayments that those changes to pricing rules would cause.

20. Thus, every Defendant that attends the Client Advisory Board Meetings has signed contracts to utilize MultiPlan's common pricing methodology for out-of-network claims. They have agreed to send providers' out-of-network bills to MultiPlan to set the prices paid for those claims. They all met in the same room at the same time and discussed the pricing methodology they would use to purchase out-of-network services. And they all implemented those pricing methodologies after those meetings.

21. During these Client Advisory Board Meetings, MultiPlan made it clear that by using MultiPlan's common pricing methodology the payors could obtain pricing results that they could not otherwise achieve by acting unilaterally due to provider or member abrasion. At these meetings, MultiPlan repeatedly emphasized that its pricing methodology could minimize abrasion while still lowering the prices paid to purchase out-of-network services.

22. In a market free from collusion, abrasion would be a significant check on providers attempting to purchase out-of-network services at sub-competitive prices. For elective services, providers would consider, threaten, or actually cease providing out-of-network services for patients associated with payors that routinely low-balled them on out-of-network compensation. That provider abrasion would undermine a central tenent of modern PPO plans—patients can see any doctor regardless of whether they are in-network and receive some health insurance coverage for those services. Indeed, in an October 14, 2024 post, MultiPlan identified abrasion as one of the

15

"Top 5" challenges payors face. However, MultiPlan assured payors that if they used MultiPlan, MultiPlan would "minimize provider abrasion."

23. The way that MultiPlan minimizes abrasion is simple. If nearly all payors in the relevant market adopt MultiPlan's common pricing methodology, there is no opportunity for abrasion. The provider has no practical choice but to accept the prices set by the MultiPlan Cartel. Thus, it is little wonder that MultiPlan touts its Data iSight algorithm as lowering payments for out-of-network services "with low provider abrasion."

24. Trustmark, Allied Benefit Systems, and GPA each used MultiPlan's Data iSight algorithm to underpay healthcare providers for out-of-network services. Records kept by MultiPlan show that the four payors have underpaid providers millions of dollars using MultiPlan's Data iSight algorithm.

25. MultiPlan's common pricing methodology is big business. Between 2021 and 2025 alone, MultiPlan's Data iSight algorithm caused providers to underpay providers by over $26 billion when measured against providers' billed charges. While MultiPlan and other members of the cartel have long claimed that the appropriate measure of prices for out-of-network services is the Fair Health database or usual, customary, and reasonable charges ("UCR"), internal records demonstrate that MultiPlan and other members of the MultiPlan Cartel measure the effectiveness of MultiPlan's pricing methodology against providers' billed charges and then allocate payments to MultiPlan (through a percentage of savings payment) and the health plan (through a shared savings charge to an employer-sponsored health plan) using the difference between providers' billed charges and the price set by MultiPlan's pricing methodology.